RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0311P (6th Cir.)
File Name: 04a0311p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            *v.*                           No. 03-4313

HARRY HERBERT WAGNER,
JR.,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 02-00803—James G. Carr, District Judge.

Argued: June 9, 2004

Decided and Filed: September 13, 2004

Before: BOGGS and MOORE, Circuit Judges; QUIST,
                District Judge.[*]

---

[*] The Honorable Gordon J. Quist, United States District Judge for the
Western District of Michigan, sitting by designation.

_____

## COUNSEL

**ARGUED:** Harland M. Britz, BRITZ & ZEMMELMAN,
Toledo, Ohio, for Appellant. Thomas A. Karol, ASSISTANT
UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.
**ON BRIEF:** Harland M. Britz, BRITZ & ZEMMELMAN,
Toledo, Ohio, for Appellant. Thomas A. Karol, ASSISTANT
UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Defendant-
Appellant Harry Herbert Wagner, Jr. ("Wagner"), a real-estate
developer in northern Ohio, appeals his conviction for
fraudulently concealing property from a bankruptcy trustee in
violation of 18 U.S.C. § 152(1) and filing a false document in
a bankruptcy proceeding in violation of 18 U.S.C. § 157(2).
Wagner was indicted in November 2002 after allegedly
making false statements to the United States Bankruptcy
Court for the Northern District of Ohio during a Chapter 7
conversion hearing and changing the locks on several
properties belonging to his estate, which the trustee was
attempting to sell. A jury convicted Wagner in April 2003,
and the United States District Court for the Northern District
of Ohio sentenced Wagner to six months' imprisonment. On
appeal, Wagner challenges his conviction, arguing that he did
not "conceal" property by changing the locks and that he did
not commit bankruptcy fraud because any falsifications he
may have made did not deceive the bankruptcy court.
Additionally, Wagner asserts that he was deprived of his
constitutional right to the effective assistance of counsel and
that the district court erred by not permitting expert evidence
regarding Wagner's alleged hearing problems. Because there

is no merit to Wagner's various arguments, we **AFFIRM** Wagner's conviction.

## I. FACTUAL HISTORY AND PROCEDURE

The factual and procedural history of Wagner's appeal can be divided into three segments: 1) the events leading up to and the declaration of Chapter 11 bankruptcy; 2) the bankruptcy court proceedings; and 3) Wagner's indictment, trial, and conviction.

### A. Wagner's Declaration of Bankruptcy and Subsequent Actions

In the mid-1970s, Wagner developed Edgewood Estates, a three-hundred acre subdivision in Lima, Ohio containing 156 rental units. Wagner also built six "smart houses," which were outfitted with electronic devices that automated various household chores. At some point after 1997, Wagner began to have difficulty with his multiple mortgage obligations, and in 1999, Wagner ceased paying several of his mortgagees. These lenders commenced foreclosure proceedings against most of Wagner's properties. At one point, Wagner was juggling over seventy-five separate foreclosure proceedings.

Seeking a way to forestall the foreclosures, Wagner contemplated declaring bankruptcy. Wagner obtained a do-it-yourself bankruptcy kit and filed a pro se Chapter 11 bankruptcy petition on April 26, 2002, which automatically stayed the foreclosure proceedings. Shortly after the filing of the Chapter 11 petition, the United States Trustee's Office contacted Wagner. Because debtors serve as their own trustees in Chapter 11 proceedings, it is standard practice for the Trustee's Office to hold an informal meeting with the debtor to advise the debtor about the timely filing of financial reports, the fiduciary duties incumbent upon the debtor, and the prohibition against selling or further encumbering disputed assets without prior approval. The Trustee's Office asked Wagner to attend such a meeting. In a bizarre letter,

Wagner refused to conference with the Trustee's Office, asking, "Are you one of the good old boys and are you bonded?" and stating, "If you persist on this meeting, that I am not going to attend, I will put this in a letter that I am writing [to the bankruptcy judge] that you are not following the due process of law in bankruptcy." Joint Appendix ("J.A.") at 603 (Letter from Wagner, 05/06/02). In several instances during the early part of May 2002, Wagner repeatedly refused to meet with the Trustee's Office and failed to produce financial documents required by the court. As a result, on May 13, 2002, the Trustee's Office filed a motion to convert Wagner's Chapter 11 bankruptcy petition to a Chapter 7 petition, under which Wagner would no longer serve as his own trustee. The Bankruptcy Court scheduled a hearing to consider this motion on June 3, 2002.

During the interlude, Wagner visited a branch office of the United States Small Business Administration ("SBA") in Columbus, Ohio on May 22, 2002. Wagner requested a loan application, but the SBA officials informed Wagner that the SBA does not distribute loan applications because the SBA does not make direct loans. Indeed, the SBA works primarily with institutional lenders, such as banks, to guarantee loans, and the application for SBA assistance is usually completed by the financial institution making the loan. One of the SBA officials attempting to assist Wagner suggested that Wagner explore the SBA's website, which fully described the SBA's program and its role in making loans. Wagner responded that he understood that the SBA did not make direct loans and that he had already looked at the website, but he persisted in asking for the loan forms, and eventually the SBA officials relented.

On Friday, May 24, 2002, and with neither authorization for a loan from the SBA nor approval from the Trustee's Office to further encumber property belonging to his estate, Wagner filed a mortgage against several of his properties. Wagner recorded with the Allen County Recorder's Office a mortgage which listed close to ninety-five properties and

included Wagner and his wife as mortgagors. Wagner attached a loan note to the mortgage, which claimed that the SBA had granted Wagner a $10.75 million loan.

The following Tuesday (Monday was Memorial Day), Wagner returned to the Recorder's Office and asked for the return of the mortgage. The Recorder informed Wagner that the mortgage could not be rescinded unless the mortgagee authorized a release, which SBA had not done, given that it was not yet aware of the purported loan's existence. Wagner then recorded a second mortgage, which listed only himself as the mortgagor. On May 30, several days after publicly recording an SBA mortgage that did not exist, Wagner submitted his "loan package" forms to the SBA. Wagner contends that the SBA accepted the loan forms, time-stamping the package, but that no individual ever informed him that his forms were improperly filed. The SBA did not formally reject Wagner's "application" until June 11, 2002.

## B. The Bankruptcy Court Proceedings and Chapter 7 Proceedings

The bankruptcy court heard the Trustee's conversion motion as scheduled on June 3. The morning of the hearing, Wagner filed a "Plan of Arrangements," a layman's stab at what is more technically known as a "Plan of Reorganization," which serves as the outline of how a debtor intends to pay his or her creditors. The document, signed by Wagner, read:

> Harry Herbert Wagner, Jr.'s Plan of Arrangement is to pay all legitimate Creditors a 100 cents on the Dollar of exactly what they are actually owed. *The Note Mortgage is in Place*, and Harry Herbert Wagner, Jr. is ready to Commence, but there are no Certified Proof of Claims to pay at the moment. Judge Mary Ann Whipple, you are letting people move this Court, who have no interest in any Claim. "Enough is Enough". If there is not a Verified Proof of Claim submitted to the Court within 30

> days from the date of this letter, they are deemed not to be a Creditor and will forfeit any right to a Claim. Upon further examination with council [sic], the amount that Harry Herbert Wagner, Jr owes may decrease. If there are any disagreements with the Verified Proof of Claims, Harry Herbert Wagner, Jr is ready to use mediation, arbitration if both parties agree, or litigation to resolve them.

J.A. at 514 (Plan of Arrangements) (emphasis added). Wagner attached three items to the Plan of Arrangements. First, he attached the second mortgage filed with the Allen County Recorder's Office, which purported to be worth $10.75 million and which listed the SBA as the mortgagee. Second, he included a mortgage note, written on an SBA form, which listed the SBA as a lender of $10.75 million at an interest rate of 6.5%. Third, Wagner included a letter from Investt Acura Cal S.A. ("IAC"), allegedly located in Kent, Washington, which expressed IAC's intent to loan Wagner up to $10.75 million. Wagner claimed that he paid $18,000 for this loan guarantee, and he characterized the IAC loan commitment as a "backup" to the SBA loan.

There were several problems with the alleged mortgage and note attached to the Plan of Arrangements. First, and most obviously, the SBA was not capable of making a loan to Wagner. Second, the SBA did not guarantee loans exceeding $1 million, so that even if Wagner had received a $10.75 million loan from a lending institution, the SBA could only guarantee a small portion of the loan amount. Third, the note referenced the alleged SBA loan as "SBA Loan 0001," which was clearly false, because the SBA employs eleven-digit loan numbers. Fourth, the 6.5% interest rate listed on the note was fabricated. Fifth, the IAC "backup" loan commitment was unverified. The IAC loan commitment filed with the plan was not written on IAC letterhead, and the government alleges that no such loan commitment ever truly existed.

At the hearing, Wagner openly testified to his recalcitrance. Wagner admitted to his refusal to meet with the Trustee's Office and further confirmed that he had not assisted the Trustee's Office in any meaningful fashion. During the hearing, Wagner initially testified that the SBA had granted his loan request. However, upon further questioning, Wagner admitted that the SBA had not actually approved the loan and that despite the lack of approval, he had still publicly recorded the mortgage.

On June 6, the bankruptcy court granted the Trustee's motion to convert Wagner's Chapter 11 bankruptcy to a Chapter 7 bankruptcy. The court also addressed and denied several motions filed by Wagner, some of which the court described as "defamatory." J.A. at 541 (Bankr. Ct. Or. 06/06/02). As to the Plan of Arrangements, the court stated that "[i]t is hard for the court to decide what the most shocking aspect of this filing is, as between the fact that it turns out [Wagner] has not actually received any loan from the SBA and has thus publically filed a fraudulent note and mortgage and the fact that all of this occurred postpetition on May 28, 2002, without any notice, a hearing, court approval or Bankruptcy Code authority." J.A. at 541-42. Finding multiple bases for conversion pursuant to 11 U.S.C. § 1112(b), including Wagner's bad faith in prosecuting his petition, Wagner's inability to create a reorganization plan, and Wagner's dereliction of his fiduciary duties to creditors, the court determined that conversion was the proper result.

As a result of the conversion, Bruce French was appointed trustee on June 6. Trustee French went to Wagner's office and informed Wagner that he was assuming control of Wagner's assets and business operations. According to Trustee French, Wagner claimed that he would not cede control of anything until Trustee French provided official documentation of his role. Allegedly, Wagner also explicitly stated that he would not cooperate with the Trustee's Office and that he considered the proceedings to be unlawful. On June 8, Trustee French drafted a letter to Wagner's tenants,

informing them that all rents were to be paid to the Trustee. A few days later, Wagner wrote a responsive letter to his tenants. Wagner claimed that all rents were still payable to him and that failure to pay rents "as usual" could result in the cessation of maintenance and lawn care.

Trustee French's difficulties with the disposition of Wagner's property were compounded by Wagner's actions with regards to three of the six "smart houses" that were among Wagner's assets. These houses were unoccupied and on the market for sale. Consequently, Trustee French hired a real estate company to sell the homes and changed the locks so as to effectuate this goal. In the beginning of July 2002, Wagner directed one of his employees to change the locks again and to return a single key for each home only to Wagner. Shortly after, one of the realtors could not show the home to a prospective buyer. Wagner claimed that he changed the locks because there was a rash of break-ins at the three houses and he wanted to control all the outstanding keys to halt any future incidents, but the government presented contrary evidence that Wagner in fact changed the locks to interfere with Trustee French's efforts.

## C. Wagner's Indictment, Trial, and Conviction

Wagner was indicted on November 6, 2002, in the United States District Court for the Northern District of Ohio. The grand jury charged three separate counts: 1) Wagner fraudulently presented the SBA mortgage and note in the Plan of Arrangements in violation of 18 U.S.C. § 157(2); 2) Wagner fraudulently ordered his tenants not to pay rent to the Trustee in violation of 18 U.S.C. § 157(3); and 3) Wagner concealed assets in violation of 18 U.S.C. § 152(1) by changing the locks on houses that were assets of the Trustee. The case proceeded to trial, and during the trial, the defense tried to call Alyssa Leaser ("Leaser"), Wagner's audiologist, to testify as to Wagner's hearing problems. The district court did not admit her testimony on relevancy grounds. The trial concluded on April 4, 2003. The jury returned a guilty

verdict on Counts One and Three, but the jury was unable to reach a unanimous verdict on Count Two. The district court sentenced Wagner to a six-month term for each conviction to run concurrently. After Wagner filed his timely notice of appeal, the district court stayed the defendant's sentence pending this appeal.

## II. ANALYSIS

On appeal, we must resolve four distinct issues: 1) the meaning of "conceal" as used in 18 U.S.C. § 152(1); 2) whether the evidence was sufficient to uphold Wagner's bankruptcy fraud conviction; 3) Wagner's ineffective assistance of counsel claim; and 4) the district court's exclusion of the testimony of Wagner's audiologist. Each issue involves a distinct standard of review, which we describe in turn.

### A. Wagner's "Concealment" of Assets

Wagner's first claim attacks his conviction for concealing three unoccupied "smart houses" from Trustee French by changing the locks on the doors of those houses. While both parties suggest that the issue is best viewed as a question of the sufficiency of the evidence, we analyze the problem differently. In essence, the parties ask us to determine whether the word "conceal," as used in § 152(1), extends to Wagner's conduct. This is not a sufficiency-of-the-evidence inquiry, as the evidence is clear that Wagner changed the locks, but rather a question of statutory interpretation. We review de novo questions of statutory interpretation. *United States v. Ninety-Three Firearms*, 330 F.3d 414, 420 (6th Cir. 2003). "We begin our analysis by looking at the language of the statute itself to determine if its meaning is plain. Plain meaning is examined by looking at the language and design of the statute as a whole." *Id.* (quotations and citations omitted). "[W]e may look to the legislative history of a statute if the statutory language is unclear." *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000).

Wagner's chief argument is that obstructing a Trustee's access to real property, and thus potentially hindering the sale of that property, does not constitute concealment under 18 U.S.C. § 152(1). We have resolved very few cases involving 18 U.S.C. § 152(1), and we have never addressed this particular issue. We begin, as always, with the text of the statute under which Wagner was convicted, which provides:

> A person who — (1) knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor . . . shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 152(1). To prove Wagner's guilt under 18 U.S.C. § 152(1), the government must show that: 1) Wagner knowing and fraudulently; 2) concealed property; 3) from the trustee; 4) that belonged to his estate. *See United States v. Christner*, 66 F.3d 922, 925-26 (8th Cir. 1995). The only issue here is whether Wagner concealed property.[1] Under either a narrow or a broad understanding of the term "conceal," we must conclude that Wagner concealed the smart houses from the trustee.

The narrow construction of "conceal" — "To hide, secrete, or withhold from the knowledge of others. . . . To cover or

---

[1] There is no doubt that the houses belonged to Wagner's bankruptcy estate and that Wagner's actions were directed at Trustee French. If there is any question about the sufficiency of the evidence demonstrating the knowing and fraudulent nature of Wagner's actions, it is resolved in favor of the government because the government presented enough evidence such that a rational juror could convict Wagner. While Wagner presented evidence that he changed the locks for the non-fraudulent purpose of keeping out vandals and robbers, the government presented evidence that Wagner in fact changed the locks to keep out the Trustee.

keep from sight. To hide or withdraw from observation, or prevent discovery of" — springs from its dictionary definition. Black's Law Dictionary 288 (6th ed. 1990); *see also* Random House Unabridged Dictionary 422 (2d ed. 1993) ("[T]o hide; withdraw or remove from observation; cover or keep from sight."). By depriving the Trustee of access to the house, Wagner concealed (*i.e.*, he hid, secreted, prevented discovery of, and withheld from the knowledge of the Trustee) the value of the property. That the Trustee knew of the house's existence does not alter our conclusion, because mere awareness of the property does not concomitantly reveal the property's value. Without access to the inside of the home, no prospective buyer could accurately assess the worth of the house and place a bid, which in turn prevented the Trustee from learning the value of the house and accordingly disposing of the estate. It would be no different if Wagner revealed to the Trustee the existence of a cache of diamonds in a locked box, but refused to give the Trustee the key to open the box, preventing a buyer (and consequently the Trustee) from assessing whether the diamonds were of pristine cut, color, and clarity such that they were worth $100,000 or were instead low-grade diamonds worth only $10,000. Like diamonds, the value of the smart house, as embodied in the sale price, cannot be known until a purchaser bids on the house, which provides the only true measure of the house's value. Few rational buyers would purchase a home without seeing the inside first. Thus, limiting access to the inside of the house effectively precluded any potential purchaser from making an informed decision, which in turn prevented the Trustee from learning the true value of the house. Such actions constitute concealment of an asset.

The purposes of § 152, the section's history, and its interpretation by other courts support a broader construction of "conceal," and applying a more encompassing definition does not alter our conclusion. Because the efficiency and manageability of the bankruptcy system relies heavily on the free flow of accurate information, § 152, like the rest of the

provisions governing bankruptcy crimes, exists not to protect individual creditors, but rather "to prevent and redress abuses of the bankruptcy *system*." 1 *Collier on Bankruptcy* ¶ 7.01[1][a], at 7-15 (15th ed. 2004) (hereinafter "*Collier*"). "[S]ection 152(1) promotes disclosure and revelation by debtors, and furthers one of the main goals of the statute: identification of all the debtor's assets and affairs so that there can be an objective evaluation of each bankruptcy estate. Thus, the statute prohibits hiding assets from bankruptcy officers *and actively frustrating collection efforts by creditors*." *Id.* at ¶ 7.02[1][a][i], at 7-22 (emphasis added); *see also Stuhley v. Hyatt*, 667 F.2d 807, 809 n.3 (9th Cir. 1982) ("[T]he principal objectives of the provisions are to prevent and punish efforts by a bankrupt to avoid the distribution of any part of a liable bankrupt estate."). Several circuits have recognized that § 152 is "a congressional attempt to cover *all* of the possible methods by which a debtor or any other person may attempt to defeat the intent and effect of the bankruptcy law through *any* type of effort to keep assets from being equitably distributed among creditors." *United States v. Goodstein*, 883 F.2d 1362, 1369 (7th Cir. 1989) (internal quotations omitted) (emphasis added); *United States v. Thayer*, 201 F.3d 214, 226 (3d Cir. 1999) (quoting *Goodstein*); *United States v. Shapiro*, 101 F.2d 375, 379 (7th Cir. 1939) ("The object of Congress in passing [§ 152] was to punish those debtors who, although wanting relief from their debts, did not want to surrender what property there was to the creditors."). Section 152 serves a broad purpose; it exists to prevent a wide array of behavior designed to stymie the bankruptcy system, and consequently it targets many different kinds of conduct.

The history of the word "conceal" in the statute also demonstrates that "conceal" has a broad meaning. Section 152, along with the other bankruptcy crimes provisions, first appeared in § 29 of the Bankruptcy Act of 1898, which was codified in Title 11 of the United States Code. *See* Bankruptcy Act of 1898, ch. 541, § 29(b), 30 Stat. 544, 554 (1898). In 1938, Congress amended the Bankruptcy Act;

§ 1(7) of those amendments stated that "'Conceal' shall include secrete, falsify, and mutilate." The Chandler Act, ch. 575, § 1(7), 52 Stat. 840, 840 (1938). In 1948, the criminal provisions of the Bankruptcy Act were moved to Title 18. *See* Crimes and Criminal Procedure Act, ch. 645, § 152, 62 Stat. 683, 689 (1948). Section 1(7) remained a part of Title 11 (even though the term it was defining was nestled in Title 18) until 1979, when the Bankruptcy Reform Act of 1978 repealed § 1(7) along with large portions of the 1898 Bankruptcy Act. Despite this repeal, courts have continued to apply an expanded definition of "conceal" in § 152(1) cases. *See Collier* ¶ 7.01[1][b][i], at 7-16 ("Courts . . . have not allowed the accident of transference to the criminal code to change settled interpretations."); *United States v. Grant*, 971 F.2d 799, 802 n.3 (1st Cir. 1992) (noting that "where appropriate we cite to authority antedating the 1979 amendment"). For example, in *Thayer*, the Third Circuit upheld a jury instruction in a § 152(1) case which read:

> Fraudulently concealing property of the estate of the debtor may include transferring property to a third party, destroying the property, withholding knowledge concerning the existence or whereabouts of property, or *knowingly doing anything else by which the person acts to hinder, delay or defraud any of the creditors.*

201 F.3d at 224 (emphasis added). Similarly, in *United States v. Turner*, 725 F.2d 1154 (8th Cir. 1984), the court adopted a comparably broad standard. It upheld the following jury instruction:

> Concealment means, not only secreting, falsifying and mutilating as specified in section 1 of the Bankruptcy Act but also includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known.

*Id.* at 1157. The court held that "[c]learly concealment means more than 'secreting'; one does not have to put something in

a hidden compartment, a safe, or a hole in the backyard in order to 'conceal' it. It is enough that one 'withholds knowledge,' or 'prevents disclosure or recognition.'" *Id.* (quotation omitted).

The purpose of § 152(1) and the broad definition of "conceal," adopted first by Congress and then by the courts, guide our holding that "conceal" in this context means more than just the act of hiding property or withdrawing it from sight. Section 152(1)'s relationship to real property highlights the problem with an overly rigid definition of "conceal." Unlike cash, bonds, stocks, or other liquid assets, real property cannot be easily hidden. Narrowly construing the word "conceal" would sharply limit the type of behavior § 152(1) can reach, which contravenes the purpose of the statute. Naturally, a debtor can withhold information about the debtor's ownership of a house, a parcel of land, or a vehicle, but such refusal to disclose information about the existence or whereabouts of real property does not exhaust the ways in which a debtor can conceal real property. Other actions, for instance, a debtor's use of physical force to prevent a trustee from approaching the debtor's property or the intentional marring of property to reduce its value to prospective buyers, hinder or obstruct the trustee's responsibilities just as much as preventing the trustee from learning about the existence of assets by "hiding" or "secreting" away such assets. *See, e.g.*, *United States v. Yagow*, 953 F.2d 427, 430 (8th Cir. 1992) (affirming, without discussion, a conviction under § 152 when the defendant warned the trustee not to enter his property and constructed a trench around his property to stymie removal of any collateral). We agree with the other circuits that have held that "concealing" property encompasses actions designed to hinder, delay, or otherwise obstruct the ability of a trustee to account for and distribute the debtor's estate. *See Thayer*, 201 F.3d at 224; *Turner*, 725 F.2d at 1157. This holding permits § 152(1) to serve its significant task of ensuring that trustees can equitably distribute assets among creditors pursuant to the bankruptcy laws without interference.

Under this standard, Wagner's modification of the locks constituted concealment. By changing the locks, Wagner prevented the Trustee from showing the property to a prospective buyer. It is true that the realtor, and thus by extension the Trustee, was inconvenienced for only a short amount of time by Wagner's decision to change the locks. Also, it is not certain that the individual(s) who wanted to view the house on that particular day would have decided to purchase it. However, such considerations are irrelevant; there is no materiality requirement in § 152(1), and Wagner would be no less criminally liable under § 152(1) if he had changed the locks knowingly and fraudulently but the realtor had not planned to show the house that particular day. *See Collier* ¶ 7.02[1][a][i], at 7-24 ("[S]ection 152(1) has no implicit or explicit materiality requirement; concealment of any asset, if done knowingly and fraudulently, can support conviction."). Wagner's intent to delay or obstruct the Trustee is enough for culpability under § 152(1).

In reaching our conclusion, we do not ignore the rule of lenity, which establishes that "in construing an ambiguous statute, a court should resolve the ambiguity in favor of the more lenient sentence." *Mallett v. United States*, 334 F.3d 491, 499 (6th Cir. 2003); *see also McElroy v. United States*, 455 U.S. 642, 658 (1982) ("[A]mbiguity concerning the reach of a criminal statute should be resolved by reading the statute narrowly in order to encourage Congress to speak clearly, thus giving the populace 'fair warning' of the line between criminal and lawful activity, and in order to have the Legislature, not the courts, define criminal activity."). In evaluating whether a statute is ambiguous for rule-of-lenity purposes, it is not enough for the plain language to be unclear; only when the plain language, structure, and legislative history provide no guidance will we apply the rule of lenity. *United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001). Whatever ambiguity may inhere in the use of the word "conceal," there is no doubt that § 152(1) is part of a clear and explicit framework of prohibitions designed to ensure the equitable distribution of assets. Accordingly, the rule of

lenity does not apply, and we uphold Wagner's conviction under § 152(1) for the concealment of property from the Trustee.

## B. Wagner's Fraudulent Representation

Wagner's second claim is that insufficient evidence exists to sustain his conviction for bankruptcy fraud pursuant to 18 U.S.C. § 157(2). Our standard of review for this type of claim presents a defendant with an uphill battle. *See United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004) ("A defendant making such a challenge bears a very heavy burden.") (quotation omitted); *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir. 2000) ("The standard for evaluating claims that a conviction is not supported by sufficient evidence presents a very difficult hurdle for the criminal appellant.") (quotation omitted). The key inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (quotation omitted). We "will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002) (quotation omitted). In analyzing such a claim, we do not weigh the evidence, evaluate witness credibility, or displace the jury's judgment with our own. *Id.*[2]

---

[2] At the conclusion of the government's case-in-chief, Wagner moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. J.A. at 187 (Trial Tr. at 576); *see* Fed. R. Crim. P. 29(a) ("After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."). The district judge first indicated that he would deny the motion but then later stated that he would take the motion under advisement. Trial Tr. at 576-77 ("MR. KLUGE: Make a Rule 29 motion for judgment of acquittal. THE COURT: That will be overruled. MR. KLUGE: You want me to articulate the reasons? THE COURT: Sure,

if you want, go ahead.  MR. KLUGE:  The Court's going to take it under advisement I won't go into – THE COURT:  I'll simply take it under advisement.  Let the record show the motion has been made, it's been taken under advisement, and I deem all the defendant's rights to be appropriately protected as of this point in the proceedings.").  However, Wagner did not renew his motion for judgment of acquittal at the close of all the evidence, and it appears that the district judge never ruled on the motion.

When a court denies a defendant's motion for judgment of acquittal at the close of the government's case-in-chief and the defendant then puts on evidence in his or her own defense without renewing the Rule 29 motion, the defendant "waives objection to the denial of his earlier motion, absent a showing of a manifest miscarriage of justice."  *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998) ("Phrased another way, where . . . a defendant does not renew his motion for judgment of acquittal for insufficiency of the evidence at the close of all of the proofs, appellate review is limited to determining whether there was a manifest miscarriage of justice.  A miscarriage of justice exists only if the record is devoid of evidence pointing to guilt.") (internal quotation marks and citations omitted).  If the defendant does renew the motion for judgment of acquittal at the close of all the evidence, the defendant still waives his or her objection to the denial of the first motion, and on appeal, all of the evidence will be considered when evaluating an insufficiency of the evidence claim.  *See United States v. Black*, 525 F.2d 668, 669 (6th Cir. 1975) ("The rule is settled that when a defendant introduces evidence, he waives any objection to the denial of his motion to acquit at the close of the government's case.  The defendant may renew his motion at the close of all the proof . . . but the court will then consider the sufficiency of the evidence on the record as a whole and not the sufficiency of the government's case in chief.") (citations omitted).

Different rules apply, however, when the court does not decide a defendant's motion for judgment of acquittal at the close of the government's case-in-chief, but rather reserves ruling on the motion.  Rule 29(b) permits judges to reserve ruling on motions for judgment of acquittal, including motions made at the close of the government's case-in-chief.  *See* Fed. R. Crim. P. 29(b) ("The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.").  Rule 29(b) mandates that when a judge reserves ruling on a motion for judgment of acquittal, the court "must decide the motion on the basis of the evidence

Wagner argues that the evidence does not support his bankruptcy-fraud conviction because his actions did not have any "proven effect on the Bankruptcy Court."  Wagner Br. at 24.  Wagner was indicted and convicted pursuant to 18 U.S.C. § 157(2), which provides:

A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of

at the time the ruling was reserved," even if the defendant has put on evidence in his or her own defense.

As the U.S. Court of Appeals for the District of Columbia Circuit noted in *United States v. Wahl*, the text of Rule 29(b) suggests that when a district judge reserves decision on a motion for judgment of acquittal at the close of the government's case-in-chief, the defendant does not waive his or her objection to the ultimate denial of the motion by failing to renew the motion at the close of all the evidence.  290 F.3d 370, 374 (D.C. Cir.), *cert. denied*, 537 U.S 862 (2002) ("The Federal Rules are silent as to whether a reserved motion must be renewed.  *See* Fed.R.Crim.P. 29.  For this reason, we see no basis for penalizing a defendant who appears before an efficient district court judge who returns to a reserved motion without prompting and enters a ruling.  We therefore hold that when a defendant moves for judgment of acquittal at the close of the government's case and the court reserves ruling until after the case is submitted to the jury under Rule 29(b), and when the court does, in fact, rule on that motion absent a renewal of that motion at the close of all evidence by the defendant, the defendant is not required to take any additional procedural steps to preserve the issue for appellate review.").  However, it is unclear whether such analysis equally applies when the district judge fails to rule on a reserved motion for judgment of acquittal and the defendant has failed to renew the motion at the close of all the evidence.  *See id.* ("[W]e are not deciding whether a waiver occurs when a defendant fails to renew a reserved motion at the close of all the evidence and the district court does not rule.").

Because Wagner's insufficiency of the evidence claim lacks merit even if we confine our review to the evidence presented in the government's case-in-chief and apply the less burdensome rational-trier-of-fact standard, we do not need to decide whether Wagner's failure to renew his reserved motion for judgment of acquittal, combined with the district court's apparent failure to rule at any point on the motion, alters our standard of review or impacts the scope of evidence to be examined.

executing or concealing such a scheme or artifice or attempting to do so — . . . (2) files a document in a proceeding under title 11 . . . shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 157(2). We have stated, "*Section 157(1) . . .* contains three elements: 1) the existence of a scheme to defraud or intent to later formulate a scheme to defraud and 2) the filing of a bankruptcy petition 3) for the purpose of executing or attempting to execute the scheme." *United States v. DeSantis*, 237 F.3d 607, 613 (6th Cir. 2001) (emphasis added); *see also United States v. McBride*, 362 F.3d 360, 373 (6th Cir. 2004); *Collier* ¶ 7.07[1], at 7-118 to 7-119. We apply the same test in analyzing § 157(2), except that we are concerned with the filing of a document in a proceeding under Title 11 rather than the filing of a bankruptcy petition. In reviewing the sufficiency of the evidence of the intent to defraud, we are mindful of the fact "that the question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned," *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003) (quotation omitted) (alteration in original).

Wagner does not dispute that there is sufficient evidence that he filed the Plan of Arrangements, which is the allegedly fraudulent document, or that the Plan served to execute the scheme if the scheme existed. Instead, Wagner chiefly contends that "there is a failure of proof that [the Plan and its attachments] are a scheme or artifice to defraud." Wagner Br. at 22. The evidence clearly belies Wagner's argument. The Plan, to which Wagner attached the falsified SBA mortgage and note, explicitly claimed that he had received a loan of $10.75 million from the SBA when in fact he had not. Furthermore and quite incredibly, at the hearing, Wagner first falsely explained that he had received a loan from the SBA before finally admitting not only that he had not received the loan, but also that he had claimed the opposite in his Plan of Arrangements and had recorded the mortgage with Allen

County, in violation of bankruptcy rules forbidding the encumbrance of property without prior approval. The Plan and the attached mortgage and note were clear fabrications because they included a fictitious interest rate and a nonexistent SBA loan number, they exceeded the SBA's loan guarantee limit, and the SBA is not even institutionally capable of making loans. Wagner's complete unwillingness to aid the Trustee's Office and his attempts to disrupt the Chapter 11 process provide collateral evidentiary support for the notion that Wagner's Plan of Arrangements constituted one more episode in a series of schemes to mislead the bankruptcy court and to delay the bankruptcy proceedings. When combined, the evidence clearly demonstrates an intent to defraud, and there is no doubt that a rational trier of fact could have found Wagner guilty.

Wagner offers several unpersuasive reasons why the evidence was insufficient. First, he claims that because the Plan of Arrangements did not cause "*anyone* to act or refrain from acting," Wagner Br. at 25, there is insufficient evidence to support his conviction. This is plainly incorrect; there is simply no requirement that the fraudulent filing have its intended effect for a defendant to be liable under § 157(2). "Success of the scheme is not an element of the crime." *DeSantis*, 237 F.3d at 613. "The [bankruptcy fraud] statute makes the crime complete upon the *filing* of the bankruptcy petition when the filing is accompanied by the other two defined circumstances. . . . Filing itself is the forbidden act." *Id.*[3] The mere filing of the Plan of Arrangements and the

---

[3] In analyzing the federal mail and wire fraud statutes, after which § 157 was patterned, we have held that "[a]ctual reliance is . . . plainly not required." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003); *see also Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("The common-law requirements of 'justifiable reliance' and 'damages[]' . . . plainly have no place in the federal fraud statutes. By prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted."); 18 U.S.C. §§ 1341, 1343 (both referring to "devis[ing] or intending to

mendacious mortgage and note are enough to create criminal liability under § 157(2) because such action is evidence of a scheme or artifice to defraud.  The purported SBA mortgage and note are no less fraudulent merely because they were unconvincing.  It would be counterproductive to hold that debtors making fraudulent statements in bankruptcy proceedings can elude prosecution simply because the bankruptcy court successfully sniffed out the misrepresentation.

Second, Wagner directs us to the legislative history of § 157(2), which he believes highlights the insufficiency of the evidence.  Section 157(2) was enacted as part of the Bankruptcy Reform Act of 1994.  Pub. L. No. 103-394, 108 Stat. 4106, 4140, § 312(a)(1)(B) (1994).  The House Report states that "[u]nder no circumstances is this section to be operative if the defendant is adjudicated as having committed the act alleged to constitute fraud for a lawful purpose."  H.R. Rep. No. 103-835, at 57 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3366.  As examples, the report suggests that § 157 would not apply when an individual makes a misrepresentation on a financial statement before filing bankruptcy so long as the individual did not make the misrepresentation in preparation for bankruptcy, nor would the statute apply if an individual made a false statement unrelated to the bankruptcy proceeding.  *Id.* at 3366-67.  This legislative history does not help Wagner, who argues that the "lawful purpose" behind his filing of the Plan of Arrangements was to demonstrate his intent to repay his creditors.  Wagner's actions can hardly be considered lawful, as his Plan fraudulently described a mortgage that did not

devise any scheme or artifice to defraud," similar to § 157); *Collier* § 7.07[1][a], at 7-119 to 7-121 (describing links between mail fraud statute and bankruptcy fraud statute).  The comparable absence of reliance as an element in both mail/wire fraud and bankruptcy fraud informs our rejection of Wagner's claim that his conviction must be overturned because no individual relied upon his misrepresentations.

exist.  Furthermore, Wagner cannot claim to fit within any of the exceptions described in the legislative history of § 157.

Third, Wagner suggests that the Plan of Arrangements was not fraudulent because even though the SBA mortgage and note were false, they were allegedly backed up by the IAC loan commitment.  In essence, Wagner claims that the Plan merely demonstrated his intent to pay his creditors and if the bankruptcy court had approved the Plan without realizing the SBA loan was a forgery, the IAC loan would have served to satisfy Wagner's creditors, such that the Plan's stated intention was not false.  This argument is factually misleading because it ignores the falsified mortgage and note attached to the Plan and referenced in the text of the Plan.  This contention also misses the point, as it is actually just a variant of Wagner's reliance contention.  Even assuming that the IAC loan commitment was real, which the government has convincingly called into question, Wagner still misrepresented the SBA mortgage and note.  Wagner did not cease either to engage in a scheme to defraud or to file a document in furtherance of that scheme simply because he had a legitimate backup plan.  The fact that the IAC loan, if it existed, might have potentially helped to satisfy his creditors does not eliminate the illegality of Wagner's false statements about an SBA loan for which he never received approval.

Fourth, Wagner suggests that he was unaware of both SBA's inability to make loans and its guarantee limit of $1 million because he could not hear the SBA officials.  It is unclear why his knowledge in this regard is relevant.  As an initial matter, the testimony from the SBA officials demonstrated convincingly that Wagner understood that the SBA could not offer him a loan, and Wagner never testified at trial that a hearing problem prevented him from understanding the SBA officials.  Yet even assuming that Wagner benignly did not comprehend the SBA's rules, he still fraudulently informed the bankruptcy court that he had received authorization for a loan when in fact he had not.

Perhaps Wagner misunderstood SBA's role as a lender, but surely from his thirty years as a developer Wagner knew that one cannot obtain a mortgage without lender approval.

In sum, the government presented adequate evidence to support Wagner's conviction for the bankruptcy fraud. A rational trier of fact could conclude that Wagner devised a scheme to defraud the court and filed his Plan of Arrangements for the purposes of furthering that scheme.

## C. Ineffective Assistance of Counsel

Wagner also argues that he was deprived of his Sixth Amendment right to the effective assistance of counsel because his counsel made several mistakes during the course of his trial. Wagner claims that his counsel erred by: 1) failing to file a motion to dismiss on the concealment charge; 2) failing to renew the Rule 29 motion for acquittal; 3) failing to argue during closing argument that there was no concealment; 4) failing to question a prosecution witness about the alleged loan commitment from IAC; 5) failing to inform the jury that Wagner's rental incomes were substantially reduced by his expenditures; and 6) failing to offer the audiologist's testimony for the proper purpose.

We review de novo claims of ineffective assistance of counsel because they are mixed questions of law and fact. *United States v. Fortson*, 194 F.3d 730, 736 (6th Cir. 1999). A direct appeal is not generally the best forum for an ineffective assistance of counsel claim.[4] "[I]n most cases a

---

[4] Wagner's improper inclusion with his appellate brief of an affidavit, which purports to establish "critical facts," Wagner Br. at 30 n.8, regarding Wagner's Sixth Amendment claim, but which was not a part of the trial court record, underscores why ineffective assistance claims are best left to collateral review. *See* Fed. R. App. P. 10(a) (limiting the record on appeal to "the original papers and exhibits filed in the district court," "the transcript of proceedings, if any," and the district court's docket entries); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th

motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance. When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose." *Massaro v. United States*, 538 U.S. 500, 504-05 (2003). Nonetheless, because of the relatively short duration of Wagner's incarceration, Wagner's appellate counsel urges us to consider his ineffective assistance of counsel claim at this time. Upon doing so, we hold that there is nothing currently in the record that permits us to conclude that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

To demonstrate a constitutional violation pursuant to *Strickland*, a defendant must show: 1) "that counsel's performance was deficient" such that it did not constitute "reasonably effective assistance," *id.* at 687; and 2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. There is nothing in the record that indicates that counsel's actions were deficient, as opposed to exercises of justifiable trial strategy, although naturally the record before us is limited on this point. Yet, even if the record highlighted clear failures in his attorney's representation, Wagner has failed to show that he was prejudiced by the purported deficiencies. Two of the six alleged deficiencies concern trial counsel's failure to challenge the "concealment" charge. Because we hold that as

---

Cir. 1992) ("This Court will not entertain on appeal factual recitations not presented to the district court."). The attachment of the affidavit signals that there may be other factual issues concerning the alleged ineffective assistance of counsel that are best analyzed by a trial court in a § 2255 proceeding during which the affidavit could be properly received.

a matter of law Wagner's undisputed actions constituted concealment, Wagner was not prejudiced by his attorney's failure to file a motion to dismiss or to argue before the jury that Wagner was not guilty of concealment. Wagner also suggests that his attorney erred by failing to renew the Rule 29 motion for acquittal. Yet, even if renewed, the motion should have been denied because the evidence is sufficient to support the conviction. Furthermore, the attorney's alleged failure to question a witness about the IAC loan and to inform the jury about Wagner's rental income did not impact the proceedings, because there was sufficient evidence supporting the bankruptcy fraud count even if the attorney had undertaken these actions. Finally, as we explain below, even if Wagner's trial counsel had offered the audiologist's testimony for the proper purpose, the district court still would have been justified in refusing its admission on account of its irrelevance. Accordingly, Wagner's *Strickland* claim fails.

## D. The Audiologist's Testimony

Wagner's final claim concerns the district court's alleged error in refusing to allow Leaser, Wagner's audiologist, to testify. During the trial, Wagner's attorney stated that Leaser would testify regarding Wagner's inability to hear and to understand the June 3 proceeding in the bankruptcy court. The government objected to the testimony on relevancy grounds, and the district court excluded Leaser's testimony on that basis. J.A. at 188-90. We review for abuse of discretion the district court's evidentiary rulings. *United States v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002). "Under this standard, we will leave rulings about admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached." *Id.* (internal quotations omitted) (alteration in original). In dealing with questions of relevance, we have accorded district courts ample discretion; "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be

lightly overruled." *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir. 2002). Under Federal Rule of Evidence 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Under this standard, we uphold the district court's exclusion of Leaser's testimony as a valid exercise of its discretion, because this testimonial evidence concerned facts that, if true, were of no consequence to Wagner's trial. At trial Wagner sought to introduce Leaser's testimony to prove that he had difficulty hearing the bankruptcy court proceedings. Even if Wagner had difficulty hearing the conversion-motion proceedings, such problems would not have impacted his filing of a fraudulent SBA mortgage and note shortly before the June 3 hearing began or his changing of the locks a month after the hearing.

On appeal, Wagner suggests that his trial counsel erred because Leaser's testimony was in fact supposed to show that Wagner failed to hear the statements of the SBA employees and thus was not aware that the SBA could neither make loans nor guarantee loans over $1 million. Yet, even if Wagner's attorney had proffered the evidence for the supposedly correct purpose, the district court would still have been justified in excluding the evidence on relevancy grounds. Any hearing problems that may have interfered with Wagner's ability to understand fully the SBA's loan-making capacity did not excuse the filing of a Plan of Arrangements containing a fraudulent mortgage and note. Wagner's alleged hearing problem has no discernible relevance, because Wagner's utterance in the bankruptcy court that he had obtained a loan when he in fact had not is fraudulent no matter his auditory comprehension of the SBA's loan policies. Therefore, the district court did not abuse its discretion in declining to admit Leaser's testimony.

### III.  CONCLUSION

In sum, all of Wagner's claims fail.  First, as a matter of law, changing the locks so as to obstruct a trustee's access to the property of the debtor's estate constitutes concealment. We accordingly uphold Wagner's conviction for violating 18 U.S.C. § 152(1).  Second, there is sufficient evidence that Wagner filed a fraudulent document in his bankruptcy proceeding.  Third, Wagner's ineffective assistance of counsel claim lacks merit because he cannot demonstrate prejudice. Fourth, we hold that the district court did not abuse its discretion in excluding the testimony of Wagner's audiologist on relevancy grounds.  Therefore, we **AFFIRM** the judgment of the district court.