NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0473n.06

No. 23-3820/3821

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 17, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) ) | UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| OLIVER JENKINS (23-3820); SHERRY-ANN JENKINS (23-3821), | ) ) ) | |
| Defendants-Appellants. | ) ) | OPINION |
| | ) | |

Before: COLE, WHITE, and DAVIS, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Defendant-Appellant Oliver Jenkins ("Oliver") was an ear, nose, and throat ("ENT") physician with the Toledo Clinic. In Spring 2014, he convinced Toledo Clinic officials to open a Cognitive Center that he would oversee and that would employ his wife, Defendant-Appellant Sherry-Ann Jenkins ("Sherry-Ann"; together with Oliver, the "Jenkinses"), who holds a Ph.D. in neuroscience. After the Toledo Clinic received complaints from patients and Clinic doctors about Sherry-Ann's treatment and billing practices, and following efforts to reform those practices, the Toledo Clinic fired Sherry-Ann and shuttered the Cognitive Center in January 2016. In May 2020, a grand jury indicted the Jenkinses on charges of mail fraud, wire fraud, health-care fraud, and conspiracy to commit these offenses. In March 2023, the government obtained guilty verdicts on all counts for both Oliver and Sherry-Ann. The district court sentenced Sherry-Ann to seventy-one months' imprisonment and Oliver to forty-one months' imprisonment. On appeal, the Jenkinses argue that (1) there was insufficient evidence for the jury

to find that they agreed to the conspiracy; (2) given their good-faith reliance on advice from Toledo Clinic employees, there was insufficient evidence to convict them on any of the four counts; (3) the district court improperly instructed the jury; and (4) the district court erred in permitting the Jenkinses to introduce into evidence only excerpts from a Toledo Clinic employee's research into proper billing practices, rather than the entire document. For the following reasons, we **AFFIRM**.

## I.    Facts

The Toledo Clinic is a physician-owned-and-operated practice of approximately 1,300 employees, including 160 to 180 physicians. According to the testimony of Dr. Ian Elliot—an endocrinologist who was, at the time, the president of the Toledo Clinic—a board of thirteen elected physicians provided financial oversight and business-management support to the physicians in the Clinic. A subset of these thirteen physicians served on an executive committee, along with non-physicians, such as legal and compliance staff. Certain members of this executive committee sat on a peer-review committee that met periodically to address "physician issues or behavior." R. 104, PageID 2531, 2582. The Toledo Clinic also had an administrator—at the relevant time, Scott Porterfield—as well as a legal department comprised of one attorney, Valerie Trudel. Finally, Sue Ann Lancaster was director of compliance for the Toledo Clinic, though she did not have formal compliance certification until 2018, after the events at issue. Lancaster acknowledged that the compliance "department" at the time was not as robust as "what people think of as a compliance department." *Id.* at 2724.[1]

Oliver joined the Toledo Clinic sometime after 2000 as an ENT doctor, or otolaryngologist. He also served on a committee that oversaw the Toledo Clinic's outpatient surgery center.

---

[1] Dr. Elliot testified that he was not comfortable with Lancaster's compliance expertise, and he believed the Toledo Clinic needed a "more robust and . . . modern compliance department." R. 104, PageID 2578.

Sherry-Ann obtained a Ph.D. in neuroscience from the University of California, Los Angeles, and conducted research at the University of Michigan, but never engaged in clinical practice before the events of this case. She had raised the Jenkinses' children full-time and sought to return to the paid workforce. Before starting the Cognitive Center with Oliver, Sherry-Ann consulted Dr. Mary Haines, a clinical psychologist. Dr. Haines recommended to Sherry-Ann "that she talk with the Medical Board and the Psychology Board . . . to make sure that however she was going to bill, if she was going to bill, that it was done appropriately." R. 102, PageID 2158.

In Spring 2014, over the course of several meetings with various members of the board of physicians, Oliver presented a business plan advocating that the Toledo Clinic open a practice called the Cognitive Center. Dr. Elliot recalled that the presentation proposed that Oliver would serve as director of the Cognitive Center, and Sherry-Ann would perform "memory testing." R. 104, PageID 2533–34. Because Sherry-Ann held a Ph.D. but had no clinical experience and was not a credentialed psychologist or physician, Dr. Elliot understood that Sherry-Ann would report the memory-testing results back to the physicians who referred the patients to the Cognitive Center. He did not recall Oliver proposing that Sherry-Ann would diagnose patients.[2] Hoping that the Cognitive Center would be successful enough to open franchised locations, the Jenkinses

---

[2] The trial testimony is less straightforward than both parties suggest regarding whether Oliver's presentation led individuals to understand that Sherry-Ann would be diagnosing patients and ordering laboratory and radiology work. An FBI agent who had interviewed Dr. Elliot recalled that he and the rest of the executive committee understood that Sherry-Ann would make such laboratory and radiology referrals, but at trial Dr. Elliot stated the opposite, perhaps because he was aware at the time that Sherry-Ann was not credentialed Dr. Elliot did not expect Sherry-Ann to diagnose patients. Porterfield, on the other hand, recalled that because Oliver led him to believe that Sherry-Ann had an "advanced degree in neuroscience studies" and was licensed to provide medical services, Porterfield expected that her work at the Cognitive Center *would* involve diagnosing patients. R. 104, PageID 2642–43. He also expected that "they" would make referrals to radiology. *Id.* at 2674. Trudel only briefly saw a limited portion of Oliver's presentation, but she "understood that the diagnosis would either be made by Dr. Oliver Jenkins or whoever was the referring physician." R. 108, PageID 3208.

drafted a side letter agreement, with the help of Trudel and the agreement of Dr. Elliot, that provided the Jenkinses with all rights to any future franchises' income.

Before opening the Cognitive Center, the Jenkinses and other Toledo Clinic employees attempted to address billing issues arising from Sherry-Ann's lack of credentialing. Although Porterfield initially understood that Sherry-Ann would be diagnosing patients because he believed she had the requisite education and credentials, he eventually learned that was not the case. To submit bills to Medicare, Medicaid, and private insurers, providers must use a unique National Provider Identifier ("NPI"). Because Sherry-Ann was not credentialed, she had no NPI. Accordingly, in mid-2014, Porterfield reached out to the Ohio Board of Psychology and the Ohio Social Worker and Marriage and Family Therapist Board to see if they would license Sherry-Ann, to no avail. By July 2014, Porterfield did not believe there was "any path forward for licensing Sherry-Ann Jenkins in the State of Ohio." *Id.* at 2654.

In September 2014, after Oliver provided Lancaster with certain Current Procedural Terminology ("CPT") codes that the Cognitive Center expected to use, Lancaster told Oliver that she was researching whether Sherry-Ann could provide services "incident to" those provided by a licensed physician, such as Oliver. *Id.* at 2692–93, 2733. Lancaster believed that for the applicable CPT codes, which concerned certain neuropsychological testing, an unlicensed provider could conduct that testing under the "general supervision" of a licensed physician. *Id.* at 2693–95, 2715, 2731, 2739. Further, she understood "general supervision" to mean that the supervising physician need not be on-site with the provider.

The Toledo Clinic hired Sherry-Ann in Fall 2014, the Cognitive Center opened that November or December, and Sherry-Ann billed for her services under Oliver's NPI.[3]

Dr. Elliot, who regularly attended meetings of the executive and peer-review committees, recalled that complaints from radiologists, neurologists, and patients arose beginning in Spring 2015. The government called various witnesses who testified about their experiences as Sherry-Ann's patients. For example, after performing cognitive tests and ordering positron emission tomography ("PET") scans, Sherry-Ann diagnosed Tracy Steele and Mary Smith with Alzheimer's disease. Sherry-Ann instructed them to take coconut oil daily to prevent memory loss, begin a non-GMO diet, and schedule follow-up appointments or phone consultations every three to four weeks.[4] Steele paid copays for her (and her family's) appointments and follow-up appointments. After Sherry-Ann recommended that Steele arrange to put her husband in a nursing home because Steele would eventually be unable to care for him, Steele invested money in modifying her home so that third-party providers could assist her husband. Steele testified that she believed Sherry-Ann was a medical doctor "[b]ecause she said she was," and that she would not have seen Sherry-Ann or paid copays had she known that Sherry-Ann was unlicensed. R. 102, PageID 2065, 2144–45. Smith likewise believed that Sherry-Ann was a physician and would not

---

[3] To bill for services, Toledo Clinic providers create a "charged ticket" containing CPT codes; codes that correspond to diagnoses; and dollar amounts. R. 104, PageID 2698. Lancaster, through her role in the compliance department, "collaborat[ed]" with providers regarding the charged tickets and periodically audited the tickets' propriety and accuracy, though the providers remained ultimately responsible for their choice of codes. *Id.* at 2576, 2697–98. According to Lancaster, certain offices within the Toledo Clinic submitted their own charged tickets into the billing system, and others sent them to a centralized Clinic department for submission. This department, however, merely submitted the charged-ticket information provided by the office and did not conduct an independent assessment of that information. The Cognitive Center provided charged tickets to the Toledo Clinic's billing team, which in turn entered that information into the billing program.

[4] Sherry-Ann eventually diagnosed Steele's entire immediate family with short-term memory loss and advised them that, in Steele's words, they "would probably all get Alzheimer's." R. 102, PageID 2093.

have sought treatment from her had she known that Sherry-Ann was unlicensed. Both Steele and Smith noticed Oliver's name appeared on certain bills despite that he had seen neither of them during their appointments.

Shawn Blazsek, whom Sherry-Ann also diagnosed with early-onset Alzheimer's disease after he completed cognitive testing and a brain PET scan, testified that the Cognitive Center over-billed him by exaggerating the length of numerous phone consultations. As with Steele and Smith, Sherry-Ann recommended that he take coconut oil and schedule follow-up appointments every three to six weeks. And like Steele and Smith, Blazsek testified that he would not have sought care from Sherry-Ann had he known she was not a licensed provider.

Another patient was a daughter of Dr. David Szczesniak, a radiologist at the Toledo Clinic. Sherry-Ann performed cognitive tests, ordered a brain PET scan, and diagnosed Dr. Szczesniak's daughter. Dr. Szczesniak had significant concerns about Sherry-Ann's process and conclusion, and he asked that the diagnosis be removed from his daughter's medical records. Dr. Szczesniak raised his concerns with Porterfield, and in a conversation with the executive committee, he analogized Sherry-Ann's process to diagnosing every patient complaining of a cough with cancer. But when licensed providers or others raised questions about Sherry-Ann's practice, she sought to discredit them or prevent her patients from consulting with them. *See* R. 108, PageID 3058–59 (Cognitive Center office manager testified that Sherry-Ann called Dr. Szczesniak an "idiot" and did not want him reading any more scans requested by the Cognitive Center because Dr. Szczesniak disagreed with Sherry-Ann's diagnosis that a particular patient had Alzheimer's disease); R. 102, PageID 2242 (Smith's sister testified that Sherry-Ann, believing that Smith did not "believe the diagnosis and . . . ha[d] been talking to other people," called Smith's sister and

asked her to "jot down all the phone numbers and the names of every person that [Smith] talked with," and not to tell Smith "any of this conversation").

Private insurers also had concerns about Sherry-Ann's practice. Paramount Care inquired whether Sherry-Ann should be added as a provider to Paramount's contract with the Clinic, but Lancaster advised them that was not possible because Sherry-Ann was not licensed. Oliver told Lancaster that the response to Paramount should be that the Cognitive Center was a "division of the department of otolaryngology" called "neuro-otology," despite that no neuro-otology division existed at the Toledo Clinic. R. 104, PageID 2709. When Lancaster conveyed to Oliver that Paramount was concerned about his "training to validate providing the services," and that Sherry-Ann, not Oliver, was signing off on the documents submitted to Paramount, Oliver challenged the authority of Paramount to regulate the Jenkinses' practices. *Id.* at 2710–11.

In August 2015, after receiving complaints from Dr. Szczesniak and Clinic radiologists who were concerned about Sherry-Ann signing brain PET-scan orders, the peer-review committee sent Sherry-Ann a letter expressing concern that she was exceeding proper practice under her credentials by diagnosing patients and ordering radiology studies. For context, before opening the Cognitive Center, the Toledo Clinic performed two to three brain PET scans per year; after opening the Center, it performed ten to fifteen *per week*. The letter also outlined a plan of correction to ensure that Sherry-Ann's practice complied with the law: First, she was to outline the scope of her practice, citing the relevant Ohio standards; second and third, she was to refrain from diagnosing patients or ordering radiology studies; and fourth, she was to consider arranging for supervision by a Toledo Clinic neurologist.

In September 2015, the peer-review committee sent another letter—this time addressed to both Sherry-Ann and Oliver—reiterating that the peer-review committee's concerns were

a "substantive issue that [Oliver and Sherry-Ann needed] to correct" but acknowledging that Sherry-Ann was making efforts to resolve the peer-review committee's concerns about her ordering diagnostic testing. *Id.* at 2555–56, 2623. Perhaps consistent with this acknowledgment, Dr. Szczesniak testified that the number of brain PET scans ordered by Sherry-Ann diminished at some point during the peer-review process.[5]

From October through December 2015, as the peer-review committee "saw more and more actual chart data about how patients were being evaluated and treated," and as it learned "more detail about who was ordering what tests," most of the committee "came to the conclusion that Sherry-Ann Jenkins was practicing as a neurologist[,] and that was unacceptable." *Id.* at 2564. The Toledo Clinic's board of physicians ultimately fired Sherry-Ann and closed the Cognitive Center in January 2016.

It was also in December 2015 that Lancaster and her compliance team realized that they had missed portions of the applicable regulations that called into question their prior interpretation of Sherry-Ann's authority to bill through Oliver's NPI as an unlicensed provider of psychological services under Oliver's general supervision. As described at trial by a fraud-prevention contractor for Medicare and Medicaid, to bill under the incident-to rule for psychological services performed by a supervised provider, the supervising physician must "first evaluate the patient personally and then initiate the course of treatment," and he must be engaged in *direct* supervision of the supervised provider, not general supervision. R. 103, PageID 2463–65. Direct supervision requires the supervising provider to be present when the unlicensed provider renders services, while general supervision only requires the supervising provider be available by phone. Further,

---

[5] Following complaints that persons other than Sherry-Ann were performing cognitive evaluations, the peer-review committee sent a third (and final) letter in October 2015 advising Sherry-Ann that regulations required that only she—not any subordinate employees—perform such tests.

the psychological services billable under the incident-to rule cannot be provided by an individual "not licensed or otherwise authorized by state law to provide psychological services." *Id.* at 2465. Based on this testimony, it appears that Lancaster was mistaken to believe that Sherry-Ann could be an unlicensed provider of these services and that she could provide them under general, not direct, supervision. In any event, Lancaster did not believe—either in September 2014 or thereafter—that the incident-to and general-supervision rules permitted Sherry-Ann to diagnose patients or order brain PET scans.[6]

Several government witnesses, including Steele and Smith, testified that Oliver never treated them. A nurse who worked for Oliver's ENT practice testified that she never saw Oliver treat any Cognitive Center patients at his ENT office, never saw such patients on his calendar, and did not believe that Oliver logged any hours at the Cognitive Center.

An FBI agent testified that Sherry-Ann treated 302 patients in total. Medicare, Medicaid, and private insurance companies paid over $255,000 for office visits and evaluations, in addition to payments for PET scans and blood work.[7] Sherry-Ann earned between $40,000 and $52,000 in base salary and appears to have received bonuses of $10,000 in May 2015, $17,000 in August 2015, and $60,000 and $12,600 in December 2015.[8]

---

[6] As relevant to one of Oliver's arguments below, while conducting her research, Lancaster maintained a 500-page file of documentation and her findings.

[7] Neither the PET-scan proceeds nor the laboratory-work proceeds accrued to the Cognitive Center, however; instead, they flowed to the relevant Toledo Clinic departments.

[8] The government asserts on appeal that Oliver, not Sherry-Ann, received this $60,000 bonus, but the investigating FBI agent's testimony at trial suggests that the bonus appeared on Sherry-Ann's pay stub. At trial, the government argued that Oliver's bonus was paid via a check issued on December 31, 2015, for $45,405.70. Subtracting Oliver's typical biweekly pay ($17,520.81) from this amount indicated, in the government's view, a bonus of $27,884.89. Oliver argued, however, that this payment was more likely related to Oliver's outpatient surgery work and an

A grand jury indicted the Jenkinses, alleging mail- and wire-fraud schemes that sought to obtain patients' money by false pretenses; a health-care-fraud scheme that sought to defraud health-care benefit programs; and conspiracy to commit those offenses. Trial took place in March 2023. After the government rested, the Jenkinses moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure, and the district court deferred its ruling. The Jenkinses then renewed that motion after the defense teams rested, and the district court again took it under advisement. The jury convicted Sherry-Ann and Oliver of all counts. Two weeks later, the Jenkinses again moved for acquittal under Rule 29 or a new trial under Rule 33, and the district court denied that motion as well as those made during trial. In September 2023, the district court sentenced Sherry-Ann to seventy-one months' imprisonment and Oliver to forty-one months' imprisonment. This appeal followed.

## II.    Analysis

### A.  Sufficiency of the Evidence

We review a sufficiency-of-the-evidence challenge de novo. *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). To prevail on a claim that the government presented insufficient evidence to sustain a conviction, a defendant must demonstrate that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006)). When assessing the Jenkinses' arguments, we "must resolve any evidentiary conflicts or credibility disputes in a manner that favors the government's version of the facts." *United States v. Hinojosa*, 67 F.4th 334, 340 (6th Cir. 2023). And "[a]lthough the evidence need not eliminate all reasonable hypotheses except that of guilt, we

---

end-of-the-year dividend that Oliver received as a physician shareholder of the Clinic, consistent with other prior end-of-year payments. In any event, the attribution is of no real consequence, and a Cognitive Center office manager testified that based on financial reports about the Center, Oliver "brag[ged]" about "how much money was being brought in." R. 108, PageID 3059–60.

must guard against 'piling inference upon inference.'" *United States v. Ouedraogo*, 531 F. App'x 731, 739–40 (6th Cir. 2013) (quoting *United States v. Sliwo*, 620 F.3d 630, 635, 638 (6th Cir. 2010)).

### 1. Agreement to Join the Conspiracy

The relevant conspiracy statute for the three substantive offenses, 18 U.S.C. § 1349, "requires a finding that the defendants agreed to commit fraud and joined the conspiracy both knowingly and voluntarily." *United States v. Betro*, 115 F.4th 429, 443 (6th Cir. 2024) (citing *United States v. Palma*, 58 F.4th 246, 249 (6th Cir. 2023)).[9] "Proof of a formal agreement is unnecessary, and a tacit or material understanding among the parties is sufficient to show a conspiracy." *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990) (citing *United States v. Hughes*, 891 F.2d 597, 601 (6th Cir. 1989)). And "[j]ust as the conspiracy may be inferred from circumstantial evidence, a defendant's knowledge of and participation in a conspiracy also may be inferred from his conduct and established by circumstantial evidence." *United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008) (citing *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989)).

The Jenkinses first argue that the evidence presented at trial, even when viewed in favor of the government, failed to establish that they knowingly entered into an agreement to conspire to commit health-care fraud,[10] because they "hid nothing from" the Toledo Clinic regarding their plans for the Cognitive Center, suggesting that they did not understand such plans to be criminal.

---

[9] Unlike certain other conspiracy statutes, § 1349 does not require the government to establish an overt act. *United States v. Rogers*, 769 F.3d 372, 380 (6th Cir. 2014).

[10] As discussed, the indictment charged the Jenkinses with conspiracy to commit not just health-care fraud, but also mail and wire fraud. They focus on health-care fraud, but in any event, all three substantive counts in this case are governed by the same conspiracy provision, § 1349, and our conclusion applies with equal force to each.

Appellant's Br. 20.[11]  In the Jenkinses' view, Oliver presented his proposal to Clinic leadership; these individuals were aware that Sherry-Ann was not credentialed and that the Cognitive Center would make referrals to other Clinic offices; Oliver sought assistance and guidance from the Clinic regarding Sherry-Ann's credentialing and her use of his NPI; and when the peer-review committee communicated its concerns to the Jenkinses, the Jenkinses took steps to comply with the peer-review committee's corrective measures.  Appellant's Br. 10–11, 13, 15, 20.  The Jenkinses also emphasize Supreme Court precedent requiring that where the government must prove that a defendant, for example, knowingly used food stamps in an unauthorized manner or knowingly possessed a firearm as an individual unlawfully in the United States, the knowledge requirement applies not just to a defendant's *conduct*; the government must also prove that the defendant knew the manner of use was not authorized, or that the individual's presence in the United States was unlawful.  *See Liparota v. United States*, 471 U.S. 419, 433 (1985); *Rehaif v. United States*, 588 U.S. 225, 235 (2019).  Although the Jenkinses do not make the connection explicit, based on their summary-of-the-argument section, they appear to be emphasizing that (1) the government must show not only that they agreed to join the conspiracy, but also that they knew that the aims of the conspiracy were unlawful, and (2) the government failed to show that Oliver knew that his putative coconspirator, Sherry-Ann, was violating the law, and therefore Oliver could not have agreed to join her in that endeavor.  *See* Appellant's Br. 8.

To be sure, there was evidence supporting the Jenkinses's theory of the case, but we cannot say that no rational juror could have found the Jenkinses guilty of conspiracy.  The trial evidence, when viewed in the light most favorable to the government, sufficed to permit the jury to reject

---

[11] Because Sherry-Ann's brief incorporates arguments from Oliver's brief, all citations are to the latter. *See* Appellant's Br., *United States v. Oliver Jenkins*, No. 23-3820 (6th Cir. March 11, 2024), D. 26.

the Jenkinses' claim that Oliver "hid nothing." Appellant's Br. 20. Oliver misrepresented the nature of Sherry-Ann's practice and credentials to key figures at the Toledo Clinic. The Jenkinses have not identified a member of Clinic leadership who approved Oliver's plans for the Cognitive Center while knowing that Sherry-Ann was unlicensed and would nonetheless diagnose patients and order laboratory and radiology work.[12] Similarly, Lancaster—on whose research the Jenkinses rely heavily for their claim that they did not believe their conduct to be unlawful—testified that even under her mistaken interpretation of the applicable regulations, she did not understand the general-supervision rule to permit Sherry-Ann to diagnose patients or order brain PET scans. And, importantly, when an insurer raised questions about Sherry-Ann's billing and Oliver's supervision, instead of reevaluating whether Sherry-Ann's practice complied with the law, Oliver challenged the insurer's authority to raise such issues and instructed Lancaster to misrepresent that the Cognitive Center was part of a fictitious division within the otolaryngology department. .

Further, patients of Sherry-Ann testified that she led them to believe she was a medical doctor, recommended that they schedule recurring appointments or phone consultations, and exaggerated the length of at least some of those consultations. These patients also testified that

---

[12] Although some Clinic leadership, such as Dr. Elliot and Trudel, knew that Sherry-Ann was not credentialed, they also understood from their discussions with Oliver that Sherry-Ann would not be diagnosing patients for that very reason. Nor did Dr. Elliot expect that Sherry-Ann would order laboratory or radiology work. Instead, Oliver told Dr. Elliot that Sherry-Ann would report the results of memory testing to the patient's referring physician. And although Porterfield testified that he expected that Sherry-Ann *would* diagnose patients, he only thought so because Oliver told him that Sherry-Ann was licensed to provide those medical services.

Further, that Oliver was not fully transparent with the Toledo Clinic is supported by the Clinic's response to this situation: (1) After the peer-review committee initiated a review based on complaints from patients and radiologists, that committee issued letters insisting that Sherry-Ann correct her practice so that it complied with the law; and (2) after that committee "saw more and more actual chart data about how patients were being evaluated and treated" and learned "more detail about who was ordering what tests," members concluded that "Sherry-Ann Jenkins was practicing as a neurologist[,] and that was unacceptable." R. 104, PageID 2564.

they would not have sought treatment from her had they known that she was unlicensed. When providers and others raised concerns about Sherry-Ann's diagnoses, she sought to silence them rather than reevaluate her practice. She did this despite being advised by Dr. Haines, before the Cognitive Center opened, to ensure that if Sherry-Ann billed, she did so correctly.

Construing this evidence in favor of the government, we conclude that a rational juror could have found that the Jenkinses worked together to (1) conceal the nature of Sherry-Ann's practice because they knew it was unlawful, and (2) agreed to commit at least one of the three types of fraud with which they were charged. A reasonable juror could find that Oliver's statements to the Toledo Clinic regarding the operation of the Cognitive Center, Sherry-Ann's credentials, and the scope of Sherry-Ann's practice do not exonerate him and instead suggest that the Jenkinses knew that their conduct would exceed legal standards. Similarly, Lancaster's advice to the Jenkinses does not undermine the jury's determination of guilt because even accepting that she wrongly concluded that Sherry-Ann could work unlicensed under general supervision, Lancaster did not advise the Jenkinses that Sherry-Ann could diagnose patients or order brain PET scans under such supervision. Finally, the Jenkinses' troubling responses to persons challenging the propriety of their conduct could indicate to a reasonable juror that the Jenkinses sought to perpetuate a scheme they knew was unlawful.

Although a reasonable juror might instead have concluded that the Jenkinses' misrepresentations and billing practices were mistakes, not the product of a criminal conspiracy, that is not the standard under which we must review the Jenkinses' claim. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) ("[C]ircumstantial evidence alone can sustain a guilty verdict and . . . [such] evidence need *not* remove every reasonable hypothesis except that of guilt."

(alterations and second brackets in original) (citation omitted)).  We therefore reject the Jenkinses'

sufficiency-of-the-evidence argument as to the conspiracy charge.

## 2.  Good-Faith Reliance

The Jenkinses raise a sufficiency-of-the-evidence challenge regarding all four counts based

on the advice they received from Trudel and Lancaster about billing Sherry-Ann's activities under

Oliver's NPI.  The sufficiency-of-the-evidence standard and conspiracy elements set forth above

apply to this claim as well.

Individuals commit health-care fraud if they "'knowingly and willfully execute[]' a scheme

to defraud a healthcare-benefit program."  *United States v. Singh*, --- F.4th ----, No. 24-3655,

2025 WL 2268031, at *3 (6th Cir. Aug. 8, 2025) (quoting 18 U.S.C. § 1347(a)).

To establish mail fraud, the government must prove "(1) the existence of a scheme to

defraud, (2) which involves the use of the mail, or of wire transmissions, (3) for the purpose of

executing the scheme." *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994) (citing

*United States v. Castile*, 795 F.2d 1273, 1277–78 (6th Cir. 1986)); *see also* 18 U.S.C. § 1341.  "A

defendant does not commit mail fraud unless he possesses the specific intent to deceive or

defraud." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997) (citing *United States v. Smith*,

39 F.3d 119, 121–22 (6th Cir. 1994)).

To sustain a wire-fraud conviction, the government must prove "(1) the existence of a

scheme to defraud, (2) use of wire communications in furtherance of the scheme, and (3) that the

scheme was intended to deprive a victim of money and property."  *Merklinger*, 16 F.3d at

678 (citing *United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990)); *see also*

18 U.S.C. § 1343.  Wire fraud requires proof of specific intent.  *United States v. Daniel*, 329 F.3d

480, 487 (6th Cir. 2003).  Because "a jury may consider circumstantial evidence of fraudulent

intent and draw reasonable inferences therefrom," the jury may infer intent "from efforts to conceal

the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (quoting *United States v. Cooper*, No. 02-40069-01-SAC, 2004 WL 432236, at *4 (D. Kan. Feb. 10, 2004)).

The Jenkinses argue that their good-faith reliance on advice from Toledo Clinic employees negates the required intent. To establish that defense, they must prove "(1) full disclosure [to the advisor] of all pertinent facts, and (2) good faith reliance on the [advisor's] advice." *United States v. Rozin*, 664 F.3d 1052, 1060 (6th Cir. 2012) (quoting *United States v. Duncan*, 850 F.2d 1104, 1116 (6th Cir. 1988), *abrogated on other grounds by*, *Schad v. Arizona*, 501 U.S. 624 (1991)). Because there was evidence that they did *not* disclose all pertinent facts to their advisors, and because the evidence submitted at trial permitted the jury to infer intent, the Jenkinses' alleged good faith did not preclude any rational juror from convicting them of the four charged counts.

When, in September 2014, Lancaster researched the possibility of billing Sherry-Ann's work under Oliver's NPI, Lancaster concluded that "neuropsychological testing" could be done by an unlicensed technician, which Lancaster understood would be Sherry-Ann's role. R. 104, PageID 2693–95. Lancaster's conclusion, however, was incorrect. The government's fraud-prevention contractor testified that, under the applicable local coverage determinations,[13] the physician providing general supervision must have "first evaluate[d] the patient personally and then initiate[d] the course of treatment," R. 103, PageID 2463–65, and that even under the "incident-to" rule, the psychological services at issue here could not be provided by an unlicensed individual, *id.* at 2465.

---

[13] Local Coverage Determinations relating to medical and other healthcare-related services are created by Medicare Administrative Contractors for specific geographic regions in the United States.

If these misunderstandings about the application of the general-supervision and incident-to rules to Sherry-Ann's memory-testing practice were the sole bases for the Jenkinses' fraud charges, they might have a strong claim of good-faith reliance. But Lancaster testified that she did not understand those rules to permit Sherry-Ann to diagnose patients or order brain-PET scans; nor did Lancaster testify that she led the Jenkinses to believe that Sherry-Ann could provide these services. *See* R. 104, PageID 2708 (reflecting Lancaster's understanding, as conveyed to Paramount, that Sherry-Ann could "only do[] the assessments and Dr. Oliver Jenkins [wa]s to be doing the interp[retations] and submitting the reports back to the referring doctors"); *id.* at 2741 (stating Lancaster's belief that under general supervision, Sherry-Ann could have done "an assessment" involving "fill[ing] out a test"); *id.* at 2757 (stating Lancaster's belief that the general-supervision rule did *not* permit Sherry-Ann to diagnose patients or order brain PET scans). The Jenkinses do not point to any evidence suggesting that Lancaster (or anyone else) advised them that Sherry-Ann, despite being unlicensed, could bill under Oliver's NPI for diagnosing patients or ordering brain PET scans.

Further, the Jenkinses assert that Trudel approved this use of Oliver's NPI; but to the extent Trudel rendered advice to them,[14] her testimony also indicates that they did not disclose all pertinent facts to her. She did not review Oliver's presentation in full, and she "understood that the diagnosis would either be made by Dr. Oliver Jenkins or whoever was the referring physician"—not Sherry-Ann. *Id.* at 3208. For these reasons, we cannot say that no rational juror

---

[14] Trudel appeared to suggest that she did not advise the Jenkinses on the issues of who could order laboratory and radiology work and whether Sherry-Ann could use Oliver's NPI, as that "was generally an area that the Compliance Department oversaw." R. 108, PageID 3217. On the other hand, she testified that she reviewed with Lancaster language from the coding manuals regarding whether Sherry-Ann could administer testing. *Id.* at 3264–65.

could have rejected the Jenkinses' good-faith defense and convicted them of the four charged counts.[15]

### B. Jury Instructions

The Jenkinses next argue that the district court improperly instructed the jury on deliberate ignorance. We review a properly preserved objection to jury instructions for abuse of discretion. *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012). As the government notes, however, although Oliver's trial counsel initially objected to a deliberate-ignorance jury instruction as inapplicable, counsel later objected only to the district court's reading of the deliberate-ignorance instruction twice (once for conspiracy, and once for health-care fraud). Counsel, in fact, conceded that the instruction was otherwise "applicable to both counts." R. 111, PageID 3643. The government argues that the Jenkinses thereby waived their objection that the deliberate-ignorance instruction was inapplicable. *See United States v. Budd*, 496 F.3d 517, 529 (6th Cir. 2007) (where defense counsel initially objected to an instruction but later stated that he was "getting more comfortable with it," the defendant waived appeal of the objection); *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990) ("An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course."). The Jenkinses argue that we should review for plain error because the record is not clear regarding what counsel

---

[15] The Jenkinses also point to other conduct indicating that they acted in good faith, such as that they and the Toledo Clinic considered entering into a supervisory arrangement with a licensed practitioner, and that the Jenkinses complied with the Toledo Clinic's directives. They also claim that for the mail- and wire-fraud counts, Oliver lacked knowledge of the criminal scheme because he did not complete or submit the billing notes to the Toledo Clinic department that inputted billing data into its system. As in section II.A.1. above, although a juror relying on this or similar evidence *might* have voted to acquit, that is not the relevant standard. The circumstantial evidence of intent in this case—including the Jenkinses' efforts to conceal or misrepresent Sherry-Ann's unlicensed practice—suffices to sustain their convictions, especially when we construe that evidence in the light favorable to the government, as we must. *See Hughes*, 505 F.3d at 592.

waived. But even if they did not waive this objection, their argument fails under plain-error review.

### 1. Deliberate Ignorance and Conspiracy

"When jury instructions are claimed to be erroneous, we review the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005) (citing *Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000)). As the Jenkinses argue, we have held that for a conspiracy charge, a jury may consider deliberate ignorance only when deciding whether the defendant knew of the conspiracy's unlawful aims. *United States v. Warshawsky*, 20 F.3d 204, 210 (6th Cir. 1994), *superseded on other grounds by guidelines*, U.S.S.G. § 2B1.1, *as recognized in*, *United States v. Nicolescu*, 17 F.4th 706, 722 (6th Cir. 2021). The government cannot prove a defendant's voluntary agreement to conspire via deliberate ignorance, however, because a defendant who deliberately remained ignorant of an agreement to conspire "could not at the same time be said to intentionally join a conspiracy." *Id.* at 211 (citing *United States v. Mankani*, 738 F.2d 538, 547 (2d Cir. 1984)). The Jenkinses argue that the district court erred by failing to "limit the jury's consideration to only the aims of the alleged conspiracy." Appellant's Br. 31.

The district court instructed the jury as follows:

> A defendant's knowledge can be proved indirectly by facts and circumstances which lead to a conclusion that he or she knew the conspiracy's main purpose. Knowledge of a defendant cannot be established merely by demonstrating that he or she was careless or negligent or foolish. However, no one can avoid responsibility for a crime by deliberately ignoring the obvious.
>
> If you are convinced that a defendant deliberately ignored a high probability that the healthcare claims submitted for reimbursement were false, then you may find that a defendant knew that this was the case. But to find this, you must be convinced beyond a

> reasonable doubt that a defendant was aware of a high probability that the claims were false or fictitious, and that a defendant deliberately closed his or her eyes to what was obvious.

R. 111, PageID 3657–58. This instruction closely tracks Sixth Circuit Pattern Jury Instruction 2.09, the use of which in a conspiracy case we have already approved. *Warshawsky*, 20 F.3d at 211 (citing *United States v. Lee*, 991 F.2d 343, 349–51 (6th Cir. 1993)). The Jenkinses acknowledge that no authority requires a district court to more expressly limit the jury's use of deliberate ignorance beyond what is already stated in the pattern instruction, and *Warshawsky* approved a similar instruction without any additional limiting language. *Id.* at 210–11.

Further limiting language is unnecessary because the pattern instructions, which the district court gave to the jury, already make clear that (1) the government must prove that the defendant both "knew the conspiracy's main purpose *and* voluntarily joined the conspiracy"; and (2) deliberate ignorance can establish knowledge. R. 111, PageID 3656–57 (emphasis added). At no point did the district court instruct the jury that deliberate ignorance can establish not just the Jenkinses' knowledge of the conspiracy's purpose but also that they voluntarily joined the agreement. *See United States v. Matthews*, 31 F.4th 436, 451 (6th Cir. 2022) ("Because the instruction was 'clearly directed toward [the defendant's] knowledge of the aims of the conspiracy, the district court was not required to give a specific instruction directing the jury that it could not find [the existence of a] conspiracy based upon a deliberate ignorance theory.'" (second alteration in original) (quoting *United States v. Smigiel*, 173 F.3d 857, 1999 WL 196575, at *3 (6th Cir. Mar. 29, 1999) (unpublished table decision))).

*United States v. Evans Landscaping Inc.*, 850 F. App'x 942 (6th Cir. 2021), cited by the Jenkinses, provides a useful contrast to the district court's proper instructions here. In *Evans Landscaping*, the district court instructed the jury that "if it found a defendant 'had deliberately ignored that a high probability that a criminal agreement existed,' it could 'find that *he knowingly*

*and voluntarily joined that agreement.*'" *Id.* at 951 (quoting jury instructions). Given *Warshawsky*, we found that instruction to be erroneous, though not plainly so. *Id.* at 951–53.

No similar error occurred here, plain or otherwise.

### 2. Deliberate Ignorance and the Charges of Mail, Wire, and Health-Care Fraud

The Jenkinses next argue that the district court erred by giving the deliberate-ignorance jury instruction for the health-care-fraud charge. Because, in the Jenkinses' view, their convictions of mail and wire fraud were dependent on their convictions of health-care fraud, they argue that the jury could have "back door[ed]" the deliberate-ignorance jury instruction for health-care fraud such that it also applied to the mail- and wire-fraud counts. Appellant's Br. 35–36. As set forth above, mail and wire fraud require proof of specific intent—*i.e.*, that the defendant made a misrepresentation with "the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *Daniel*, 329 F.3d at 487 (quoting *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)) (wire fraud); *see also Frost*, 125 F.3d at 354 (mail fraud). Although the Jenkinses cite no authority, they presumably rely on cases that hold that "[o]ne cannot be deliberately ignorant (in order to convict for the knowledge element)" of criminal conduct "and still have the purpose of" engaging in that same criminal conduct. *United States v. Chen*, 913 F.2d 183, 190 (5th Cir. 1990) (deliberate-ignorance jury instruction was inappropriate where the government argued that the defendant was deliberately ignorant of drug activity occurring on her premises but, at the same time, maintained those premises with the express purpose that drug activity occur there).

We must resolve a few preliminary issues. First, mail fraud and wire fraud are substantive offenses that do not depend on the violation of another statute. *United States v. Manzer*, 69 F.3d 222, 226 (8th Cir. 1995). When the Jenkinses argue that the mail- and wire-fraud charges depended on the health-care-fraud charge, we therefore understand them to mean that because the

charges arise from many of the same facts, the jury may have applied instructions for one charge to another. In any event, we need not speculate about any possible back-door transfer of instructions from the health-care-fraud charge to the mail- and wire-fraud charges, because after instructing the jury on the four counts, the district court stated, "Now for some definitions *that apply to Counts 2, 3, and 4*"—*i.e.*, the mail-, wire-, and health-care-fraud charges. R. 111, PageID 3659–60 (emphasis added). The district court then read, for a second time, the deliberate-ignorance jury instruction. That instruction therefore entered through the *front* door in its application to the mail- and wire-fraud charges.

Second, the Jenkinses frame their challenge to the instruction as relating to the health-care-fraud count. But their briefing suggests the same problem exists as to all three specific-intent offenses—health-care, mail, and wire fraud. Although the Jenkinses likely waived their objection to the deliberate-ignorance jury instruction for health-care fraud by conceding that it was "applicable" to that count, *id.* at 3642–43, Oliver's counsel never conceded that the instruction applied to mail or wire fraud. On the other hand, counsel did not object when the district court stated that the instruction "appl[ied] to Counts 2, 3, and 4." *Id.* at 3659. "If an objection to a jury instruction was not preserved before the district court, we review the instruction under the plain-error standard, considering whether the instructions, when taken as a whole, were so clearly wrong as to produce a grave miscarriage of justice." *United States v. Gandy*, 926 F.3d 248, 265 (6th Cir. 2019) (internal quotation marks omitted) (quoting *United States v. Wood*, 364 F.3d 704, 708 (6th Cir. 2004)).

Accordingly, we turn to whether a district court plainly errs when it instructs a jury that it may infer knowledge of certain facts from deliberate ignorance for crimes that require specific intent. To begin, there is no per se bar against such an instruction. *United States v. Griffin*,

524 F.3d 71, 79 n.6 (1st Cir. 2008) ("The circuits are uniform in approving willful blindness instructions for specific intent criminal offenses.") (citing *United States v. Alston–Graves*, 435 F.3d 331, 338 n.2 (D.C. Cir. 2006) (gathering cases)). This circuit in particular has permitted the consideration of deliberate ignorance in mail- or wire-fraud cases. *See, e.g.*, *United States v. Bohn*, 281 F. App'x 430, 439–40 (6th Cir. 2008) (per curiam) (evidence sufficed to establish that the defendant was deliberately ignorant of fraudulent statements in a lottery company's promotional materials and intended to assist that company in the mail-fraud scheme); *United States v. Williams*, 117 F.3d 1421, 1997 WL 369436, at *3 (6th Cir. July 1, 1997) (per curiam) (unpublished table decision) (deliberate-ignorance jury instruction was appropriate in wire-fraud case in which "the government did not claim that Defendant committed wire fraud . . . in deliberate ignorance of [its] illegality," but rather that the defendant was deliberately ignorant as to whether an individual had transferred money to the defendant with due authorization).

Here, the district court explained that for mail, wire, and health-care fraud, "[t]o act with intent to defraud means to act with an intent to deceive or cheat for the purpose of either causing a financial loss to another or bringing about a financial gain to oneself." R. 111, PageID 3661. In contrast, when instructing the jury on deliberate ignorance for these three charges, the district court tied the instruction specifically to whether the Jenkinses "deliberately ignored a high probability that the healthcare claims submitted for reimbursement were false," in which case the jury could "find that a defendant knew that this was the case." *Id.* at 3660. As is apparent from the face of the instructions, even if the jury concluded, based on deliberate ignorance, that the Jenkinses knew the claims submitted for reimbursement were false, it would not necessarily follow that the Jenkinses acted with specific intent to defraud. Under the district court's instructions, the jury still needed to consider whether the Jenkinses engaged in the alleged conduct with the specific intent

to deceive or cheat for the purpose of causing financial loss to others or for their own pecuniary benefit. At no point did the court instruct that deliberate ignorance of the likely falsity of the claims equated with specific intent to defraud. The district court instructed the jury regarding two distinct concepts: knowledge, inferred from deliberate ignorance, of the claims' falsity; and the Jenkinses' specific intent to deceive patients for a pecuniary purpose.

Accordingly, the district court did not plainly err when it provided the deliberate-ignorance instruction to the charges of mail, wire, and health-care fraud.

### 3. Unindicted Co-conspirator

The Jenkinses next challenge the unindicted-co-conspirator instruction. The Jenkinses objected to that instruction, so we review for abuse of discretion. *United States v. Ashrafkhan*, 964 F.3d 574, 577 (6th Cir. 2020) (citing *United States v. Eaton*, 784 F.3d 298, 306 (6th Cir. 2015)). Under that standard, "[w]e will reverse . . . 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial,' and a reversal of a conviction is generally unwarranted unless the instructions have clearly misstated the law." *Id.* (internal citation omitted) (first quoting *United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010); and then citing *United States v. Lawrence*, 735 F.3d 385, 428 (6th Cir. 2013)). The Jenkinses also point to a portion of the government's closing argument that reiterated the district court's unindicted-co-conspirator instruction, but the record does not show that they objected to the government's statements. Accordingly, we review those comments for plain error. *United States v. Chavez*, 951 F.3d 349, 357 (6th Cir. 2020). An error in the government's closing argument is plain only if it is "so obvious that 'the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely [objection].'" *Id.* (quoting *United States v. Frady*, 456 U.S. 152, 163 (1982)).

The Jenkinses argue, without further legal analysis or citation, that by instructing the jury on unindicted co-conspirators, the district court "permitted the jury to believe the criminal

agreement was with Lancaster, effectively blocking fair consideration of the good-faith defense."

Appellant's Br. 31–32. In relevant part, the district court instructed the jury as follows:

> Some of the people who may have been involved in these events are not on trial. This does not matter. There is no requirement that all members of a conspiracy be charged and prosecuted, or tried together in one proceeding.
>
> Nor is there any requirement that the names of the other conspirators be known. An indictment can charge a defendant with a conspiracy involving people whose names are not known, as long as the government can prove that the defendant conspired with one or more of them. Whether they are named or not does not matter.

R. 111, PageID 3645–46. The district court's instruction largely mirrors Sixth Circuit Pattern Jury Instruction 3.06. Similarly, the government stated the following in its closing argument:

> Something to remember, the two or more people [joining a conspiracy agreement] do not have to be Oliver and Sherry-Ann Jenkins. It could be Oliver, Sherry-Ann, and Scott Porterfield, or Sue Ann Lancaster. The crucial issue for each defendant is that some group of people agree to commit mail, wire, and healthcare fraud; and, second, that whichever defendant you're considering, Oliver or Sherry-Ann, they joined that group in their agreement, knowingly, their mutual understanding.
>
> Remember also this from the instructions, whether anyone else should be prosecuted and convicted for these crimes is not a proper matter for you to consider. The possible guilt of others is no defense to a criminal charge. Do not let the possible guilt of others influence your decision in any way. Consider that to the extent you consider Sue Ann Lancaster or some other person potentially culpable in this scheme.

*Id.* at 3687–88.

The district court did not abuse its discretion in giving this instruction. A significant portion of the Jenkinses' defense at trial was that the Toledo Clinic leadership understood everything the Jenkinses were doing and, in fact, supported the Jenkinses because of the profits to be made—a position that might suggest to the jury that others within the Toledo Clinic deserved some or all of the blame for any fraud. The Jenkinses made this point in their opening statements.

*See* R. 102, PageID 2035 ("[S]enior leadership within the Toledo Clinic recognized this fact [that the Cognitive Center would be profitable], and that's why they supported . . . Dr. Jenkins'[s] proposal . . . for the Cognitive Center."); *id.* at 2036 ("[T]he government wants you to believe that the establishment of an operation of a Cognitive Center was all for the Jenkinses and that others within the Toledo Clinic were only marginally involved, but we will prove that is not correct."); *id.* at 2044 ("Senior leadership in the Toledo Clinic fully recognized the amount of revenue that was being generated not for the Cognitive Center, but by and for the laboratory and the radiology departments."); *id.* at 2046 ("The narrative from senior leadership changed [once it learned of the government investigation] such that it was to be that the Cognitive Center was all the Jenkins[es]' fault."). They also made this point in their examinations of witnesses. *See, e.g.*, R. 109, PageID 3418 (noting that notwithstanding the peer-review committee's letters, "the Cognitive Center continued to run[,] . . . the clinic didn't shut it down[,] . . . [a]nd they continued to collect money"); R. 104, PageID 2633, 2578, 2583. And they made it in their closing statements. *See* R. 111, PageID 3703 (arguing that "when the government stands up and says profits over patients, they're talking about the Toledo Clinic," because "the Toledo Clinic was aware of these problems" (*i.e.*, complaints from patients and doctors); had "no urgency" in conducting the peer review; should have "paid . . . closer attention to" the peer review "given all the manipulations and workarounds that they had to do to get this thing off the ground"; and only claimed to have been misled by the Jenkinses "when the FBI showed up").

At the charging conference, the Jenkinses argued that their "point [was] that mistakes can be made, . . . but it doesn't make [others in the Toledo Clinic] a co-conspirator." R. 110, PageID 3509–10. Still, as the district court recognized, "[t]here certainly has been testimony about the folks at the Toledo Clinic and the inference that they should share some or all of the blame for

whatever happened." *Id.* at 3509. Defense counsel's theory that others at the Toledo Clinic bore more responsibility than the Jenkinses for any wrongdoing clearly justified the district court's instruction regarding unindicted co-conspirators, especially considering that the district court made no mention of any particular person at the Toledo Clinic. Accordingly, we cannot say that the district court's instructions were confusing, misleading, or prejudicial.

The Jenkinses' argument is more convincingly directed at the government's mention of Lancaster in closing. But they failed to object to the government's closing, and we cannot say under plain-error review that the district court and prosecutor were derelict in countenancing these brief comments. To begin, the government's general characterization of the law was correct and simply reiterated the district court's appropriate jury instructions. And although defense counsel may have sought to shift blame primarily to Toledo Clinic leadership, not Lancaster, defense counsel also elicited that the FBI interviewed Lancaster. Perhaps most importantly, the Jenkinses do not explain how the government's brief mention of Lancaster in closing "effectively block[ed] fair consideration of the good-faith defense." Appellants' Br. 32. As noted, this theory was a centerpiece of the Jenkinses' defense, and the government's passing suggestion that "Scott Porterfield[] or Sue Ann Lancaster" could have been an unindicted co-conspirator did not somehow nullify the body of evidence that the Jenkinses developed regarding their putative good faith. Indeed, the government made clear that to be unindicted co-conspirators, Porterfield or Lancaster would have to have "agree[d] to commit mail, wire, and healthcare fraud," and that to convict, each defendant must have "joined that group in their agreement, knowingly." R. 111, PageID 3687. We therefore reject the Jenkinses' claim of error.

### C. Admission of Lancaster's Research

Finally, the Jenkinses argue that the district court should have permitted them to introduce the 544 pages of research that Lancaster conducted on the issue of billing certain codes under

Oliver's NPI, because in their view, Lancaster's voluminous and diligent work underscored the Jenkinses' good-faith reliance on that research. The district court decided that defense counsel could "go through and pick out the pages [counsel] want[ed]" to "make [counsel's] point," because it would be "unfair to data dump 500 pages plus that aren't in [evidence]." R. 110, PageID 3546. Defense counsel indeed acknowledged that he did not "expect the jury to read all" 544 pages. *Id.* at 3547. When defense counsel argued that part of the research file's value was permitting "the jury to see . . . the volume of work that [Lancaster] did," the court ruled that counsel could "hold it up" to achieve the same effect. *Id.* Finally, when defense counsel argued that reviewing the research file would help the jury confirm what research Lancaster performed on which dates, the district court confirmed with the government that, whatever the documents say, it would not "contradict the timeline" established at trial. *Id.* at 3548. Based on the foregoing, the district court ruled that there was "more prejudice than relevance." *Id.*

We review the district court's evidentiary rulings for abuse of discretion. *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005) (citing *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004)). Regarding "determinations of admissibility based on considerations of relevance and prejudice," we give district courts "[b]road discretion" and do not "lightly overrule[]" those decisions. *Id.* (quoting *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995)). Accordingly, to overturn the district court, we must be "left with the definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached." *Id.* (alterations in original) (quoting *Wagner*, 382 F.3d at 616).

The Federal Rules of Evidence permit a district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "needlessly presenting cumulative evidence." Fed. R. Evid. 403. Witnesses including Porterfield and

Lancaster testified extensively about the steps they took to address the issue of Sherry-Ann's ability to perform and bill for memory-testing services. These witnesses testified to their understanding, mistaken or otherwise, of what the regulations permitted Sherry-Ann to do. Other witnesses, such as the fraud-prevention contractor for Medicare and Medicaid, testified about the correct interpretation of those rules. The research file would therefore have been cumulative and potentially confusing regarding those issues. To the extent that the Jenkinses sought to underscore the extensive nature of Lancaster's research, her testimony made clear that she compiled hundreds of pages over the course of months, and the district court permitted defense counsel to show the jury the size of the research file. As the district court noted, admitting the entire research file would not have "accomplishe[d] [defense counsel's] purpose any better than" what the court allowed, R. 110, PageID 3547, and the district court's method provided the added benefit of avoiding "needlessly . . . cumulative evidence," *see* Fed. R. Evid. 403. We therefore are not left with a "definite and firm conviction" that the district court erred.[16] *See Dixon*, 413 F.3d at 544.

Finally, the Jenkinses argue that the district court's ruling infringed their right, pursuant to due process or the Sixth Amendment, to present a complete defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard."). But although "the Constitution . . . prohibits

---

[16] Even if the district court had erred, it would have been harmless. As we explained above, the trial evidence sufficed to support the jury's apparent rejection of the Jenkinses' good-faith defense. Whether the district court had permitted the jury to peruse Lancaster's research file would not have had any bearing on the fact that Lancaster did not advise the Jenkinses that Sherry-Ann, despite being unlicensed, could diagnose patients and order laboratory and radiology work.

Additionally, the Jenkinses argue that the research file belied any suggestion that Lancaster was an unindicted co-conspirator acting with any criminal intent. But as with the research file's bearing on the good-faith defense, the Jenkinses were able to make their point with equal force by thoroughly cross-examining Lancaster regarding her research and showing the jury the size of the research file.

the exclusion of defense evidence under rules that are designed to serve no legitimate purpose or that are disproportionate to the ends they are asserted to promote," a defendant conversely "does not have an unfettered right to offer evidence that is . . . inadmissible under standard rules of evidence." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (citation modified) (first quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006); and then quoting *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996)).

Here, the Jenkinses' purported good-faith reliance on Lancaster's research was a centerpiece of their defense. They elicited testimony from numerous witnesses, including Lancaster herself, on this issue. And the district court permitted the Jenkinses to show the jury the size of the research file and select key excerpts from it. The district court, by precluding the Jenkinses from introducing over 500 pages of material that was cumulative of trial testimony, did not prevent the Jenkinses from presenting their good-faith reliance defense. *See id.* at 755 ("The exclusion of cumulative testimony does not impair the right to present a meaningful defense."). We therefore reject this argument.

### III. Conclusion

For the above reasons, we **AFFIRM**.